**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TAMMY J. HARPER,**

      **Plaintiff,**

                               **Civil Action 2:13-cv-123**
   **v.**                         **Judge James L. Graham**
                               **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

      Plaintiff, Tammy J. Harper, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United State Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Specific Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 19), Plaintiff's Reply to Defendant's Memorandum in Opposition (ECF No. 20), the administrative record (ECF No. 10), and the supplemental administrative record (ECF No. 17). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Specific Errors and **AFFIRM** The Commissioner's decision.

**I.      BACKGROUND**

      Plaintiff filed an application for benefits on April 19, 2007, alleging that she has been disabled since January 31, 2007, at age 43. (PageID No. 127.) Se alleged disability as a result of

bipolar disorder and memory loss due to a car wreck in which she sustained head injuries. (PageID No. 237–44, 267.)  After Plaintiff's application was denied initially and upon reconsideration, she sought a *de novo* hearing before an administrative law judge ("ALJ"). (PageID No. 130–33.)  The ALJ held a hearing on November 10, 2009 ("the first hearing"), and issued a decision ("the first decision"), that Plaintiff was not disabled.  (PageID No. 127–51.)  Upon Plaintiff's timely request for review, the Appeals Council vacated and remanded that decision.  (PageID No. 158–60.)  The Appeals Council found that the ALJ failed to adequately explain why the medical opinion offered by Plaintiff's treating psychiatrist, Dr. Thomas Vajen, was inconsistent with the substantial evidence in the record.  (PageID No. 158-60.)  The Appeals Council also found that the ALJ failed to adequately explain why the opinion offered by Plaintiff's counselor, Gail Campbell, was not given full weight.  *Id.*

After a second hearing on April 12, 2012 ("the second hearing"), the ALJ issued a decision on May 2, 2012 ("the second decision"), that Plaintiff was not disabled.  (PageID No. 48–65.)  The Appeals Court declined to review that decision.  (PageID No. 39–43.)  Plaintiff then timely commenced this action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified that she is disabled due to panic attacks and social anxiety.  (PageID No. 93.)  She described experiencing panic and anxiety when she is around groups of people that she does not know, suffers hourly mood swings, and has daily crying spells.  (PageID No. 93–94.)  She also stated that attention and concentration issues make reading and watching television difficult for her, and anxiety interrupts her sleep and causes her to be tired.  (PageID No. 95–96.)  She described currently having depressive thoughts, and said that such thoughts caused her to

attempt an overdose three or four years previously.  (PageID No. 97.)  When her stress levels are elevated, she stated that she also hears and sees things, like voices and shadows that are not there.  (PageID No. 97–98.)

Plaintiff stated she was separated from her husband at the time of the first hearing but testified that she lived with him and three of her five children at the time of the second hearing. (PageID No. 92–93).  At the first hearing, Plaintiff testified that she served four months in jail after being convicted of four DUIs and was convicted of falsification after selling her house illegally.  (PageID No. 104, 109–110.)  She has, however, regained her driver's license.  (PageID No. 110.)  She denied being able to do a number of activities such as reading, exercising, and taking her son to sporting events even though she told doctors that she enjoyed those activities. (PageID No. 108-110.)  Further, Plaintiff denied being able to cook or shop without assistance from her husband, her daughter, or a nurse that visits her home to help take care of her disabled son. (PageID No. 93, 98, 107–108.)  She also denied leaving the house by herself.  (PageID No. 115.)  She states that she walks a quarter to a half a mile two or three times a week for exercise. (PageID No. 106.)

Plaintiff indicated that attended cosmetology school in 1982 and a technical college for a few months in 1996.  She also testified that dropped out of technical school because she had difficulties with reading, studying, and being around people.  (PageID No. 104–105.)  She said that she was assigned to special education classes during high school.  (PageID No. 106.)  She explained that she previously collected Social Security benefits but stopped receiving them when she returned to work.  (PageID No. 115.)

**B.  The Vocational Expert's Testimony**

Barry Brown, a vocational expert ("VE"), testified at the first hearing.  The ALJ asked the VE to consider a hypothetical person with Plaintiff's age, work experience, and education, with no physical limitations but with borderline intellectual functioning; the ability to understand, remember, and carry out simple tasks and instructions; the ability to maintain concentration and attention for two hour segments over an eight hour work period; the ability to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; and the ability to adapt to simple changes and avoid hazards in a setting without strict production standards.  The VE testified that such a person would not be able to perform Plaintiff's past work, which he characterized as "home health aide, medium, semi-skilled."  (PageID No. 116–117.)  That individual could, however, perform medium, unskilled jobs such as cleaner, with approximately 3,000 such jobs in the local economy and 2.5 million jobs nationally; hand packager, with approximately 300 jobs in the local economy and 250,000 jobs nationally; or machine tender, with approximately 400 such jobs locally, and 190,000 jobs nationally.  (PageID No. 117.)

### III.  MEDICAL RECORDS

**A.  Records Related to Plaintiff's Head Injury**

Plaintiff was in a car accident in 1998 and alleges brain trauma as result.  Records from Grant Hospital indicate that Plaintiff was hospitalized and received stitches for a laceration after she was in an auto accident on September 30, 1998.  (PageID No. 392.)  Her hospital treatment was "grossly unremarkable."  (*Id.*)  The records state that Plaintiff suffered "questionable loss of consciousness" at the scene of the accident.  (*Id.*)  She received two CT scans before she was released from Grant Hospital three days later on October 3, 1998. (*Id.*)

On December 1, 2008, Plaintiff provided intake information to Dr. Mazen K. Eldadah, a neurologist.  (PageID No. 574.)  She stated to Dr. Eldadah that she had problems with headaches, memory, and passing out.  (*Id.*)  The headaches, which started at the top of the head and went back, occurred daily but varied in strength.  (*Id.*)  Plaintiff further reported depression, anxiety, and a history of alcohol abuse. (*Id.*)  When Dr. Eldadah examined Plaintiff on February 2, 2009, her sensory examination was intact and her station and gate were normal.  (PageID No. 572.)  Plaintiff told Dr. Eldadah that her headaches "felt better" and good after using Fioticet, which was prescribed by her primary care physician.  (*Id.*)  Dr. Eldadah opined that several of her symptoms were likely related to mental health issues, that her dosage of Xanax prescribed for those issues may have been too high, and that she should continue with the Fioticet.  (*Id.*)

Dr. Mark Weaver consultatively examined Plaintiff for residual effects of traumatic brain injury on November 10, 2010.  (PageID No.  635–39.)  Plaintiff told Dr. Weaver that she had problems with short term memory, concentration, dizziness, and balance.  (*Id.*)  Dr. Weaver noted that although Plaintiff exhibited a few balance issues while walking, her gait was normal and symmetrical and she did not require ambulatory aids to walk.  (*Id.*)  The rest of his examination, including x-rays of Plaintiff's cervical and lumbar spine, resulted in generally normal findings.  (*Id.*)  Dr. Weaver concluded that Plaintiff would be "limited in the performance of physical activities that involved travel, acute balance skills, operating at heights or around hazardous machinery, walking or climbing without hand support, lifting and carrying and following directions."  (*Id.*)  She would, however, be able to perform "physical activities involving sitting standing, handling objects, speaking, and hearing."  (*Id.*)

**B.** **Plaintiff's Treatment With Six County, Inc.**

On May 15, 2007, Plaintiff sought out mental health treatment for bipolar disorder from Six County, Inc. ("Six County") where she had received treatment for the same in 2003. (PageID No. 425–26.)  During intake, she reported being diagnosed with bi-polar disorder and ADHD in high school, receiving intermittent treatment for bi-polar disorder since 1997, and believing that she likely needed consistent medicine.  (PageID No. 425.)  She also reported self-doubts and troubles getting motivated, staying on task, and time management.  (R. at 426.)  She described herself as active, a good mother, and said she had good insight and determination. (*Id.*)  She also related that despite having social anxiety, she had one good friend, some acquaintances, attended AA on occasion, and took her son to the Special Olympics.  (PageID No. 426, 430.)  She also loved reading, exercising, and nursing but was unable to "do this" because of a felony conviction.  (PageID No. 426–27.)  She reported a past history of alcohol problems, seven DUI convictions, and a felony conviction for falsification to Six County.  (PageID No. 429.)  She was often anxious, especially around people, experienced panic three times a day, and was more worried and depressed lately.  (PageID No. at 430.)  She had nightmares about being caught driving drunk, was anxious when driving, and easily startled.  (*Id.*)  The mental status exam indicated that Plaintiff's appearance, demeanor, and thought contents were good, her thought processes were logical, her affect was full, her behavior cooperative, and she had no recognized cognitive impairments.  (PageID No. 436.)  Plaintiff was diagnosed with bi-polar disorder, and PTSD related to her car accident 9 years prior.  (R. at 433–34.)  Plaintiff was

assigned a GAF score of 68[1] and told that outpatient counseling and medicines were recommended to manage her mood and anxiety.  (PageID No. 434.)

### 1.    Treating Physicians, Drs. Wheaton Wood and Billy Ray Hunter

Plaintiff thereafter received outpatient treatment at Six County from several doctors, including Dr. Wheaton Wood, and Dr. Billy Ray Hunter.  On August 2, 2007, Dr. Wood's mental status examination reflected that Plaintiff's mood and speech were anxious and that her anxiety interfered with her concentration and attention.  (PageID No. 486.)  Her memory, however, was intact.  (*Id.*)  Dr. Wood wrote that Plaintiff's chief complaint was anxiety.  (*Id.*)  Dr. Wood prescribed several medications, including Neurotin.  (PageID No. 487.)  During her next office visit, Plaintiff reported to Dr. Wood that the Neurotin helped but its effect wore off.  (PageID No. 549.)  Dr. Wood noted that Plaintiff was "very somatizing" with "disorganized exaggerated affective presentation."  (PageID No. 550.)  Dr. Wood increased the dosage of Neurotin.  (PageID No. 549.)  He also wrote that Plaintiff did not appear able to work because of issues with anxiety as opposed to bi-polar related issues, but he would continue to clarify his diagnosis.  (PageID No. 549.)

In September of 2007, Dr. Wood noted that he was changing his initial diagnosis of histrionic personality disorder with anxiety to histrionic personality disorder with bi-polar issues.  (PageID No. 546.)  He indicated that Plaintiff's mood was mildly manic, and she exhibited disorganization, poor organization, and poor concentration.  (PageId No. 545.)  Plaintiff told Dr.

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 68 is only indicative of mild symptoms or only "some" difficulty in social, occupational, or school functioning.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

Wood that she had headaches all her life, migraines with auras since her 1998 car accident, and that the Prozac he prescribed was making her headaches worse.  (Id.)  Dr. Wood changed Plaintiff's prescriptions, including discontinuing Prozac, and estimated that she was unable to work for six months.  (PageID No. 546.)

Plaintiff called Tri-County several days later to complain about her medication changes and report depression, but missed her next appointment on November 1, 2007.  (PageID No. 547, 543.)  Dr. Wood refused Plaintiff's request to restart Prozac because it aggravated her headaches, but he did prescribe anti-depressants.  (PageID No. 543.)  Plaintiff called Tri-County again on November 12, 2007, and admitted that she had continued to take the Prozac even though it was discontinued in September, and now requested Effexor.  ((PageID No. 542.)  That request was granted.  (*Id.*)  During another call to tri-County on December 6, 2007, Plaintiff reported more depression and asked to be seen before her scheduled appointment on December 20, 2007. (PageID No. 541.)  Dr. Wood did not see Plaintiff before that date.  (PageID No. 539.)  At that December 20 appointment, Dr. Wood opined that Plaintiff's diagnosis might be histrionic personality disorder with recurrent mood disorder, and noted that this "odd diagnosis" reflected Plaintiff's recurrent minor but reactive depression, which suggested recurrent atypical depression.  (*Id.*)  Plaintiff was "tearful and low" at this appointment and related that her disability hearing did not go well.  (*Id.*)   Dr. Wood's mental status exam stated that Plaintiff exhibited self-loathing, self-hatred, remorse, helplessness, hopelessness, externalization, and out of proportion emotions—mostly tearfulness.  (*Id.*)  Plaintiff called Tri-County a week later to report depression and request that her Ativan be increased.  (PageID No. 537.)

On February 2, 2008, Dr. Wood wrote that Plaintiff's mood was depressed, affect congruent, mentation logical, perception normal, but she had feelings of hopelessness and guilt,

some of which were reasonable but others of which were disproportionate. (PageID No. 535.) Plaintiff expressed being down about her life and her children. (*Id.*) Dr. Wood noted that she had "[s]ignificant (moderate) Non Psychotic (atypical) Depression, with difficulty working, because of low energy." (PageID No. 535.) Dr. Wood noted that this had been difficult to treat, and changed Plaintiff's prescriptions to include lithium. (*Id.*) Plaintiff called Tri-County several times in March and April of 2008 to complain about her medications, and they were changed. (PageID No. 534, 532, 533.) On April 28, 2008, Dr. Wood noted filling out a Columbia Gas waiver for Plaintiff, and stated that "unfortunately for [Plaintiff] there is no well characterized drug treatment for her condition, which is likely to be lifelong." (PageID No. 531.)

In May of 2008, Dr. Wood wrote about several changes to Plaintiff's medications, and noted that on her new regime, she was "doing well." (PageID No. 529.) He also wrote that Plaintiff had superficial mentation with somatizing defenses, poor judgement, normal mood, and a congruent and exaggerated affect. (*Id.*) Plaintiff told Dr. Wood that it was "a lot of work" and stressful to have four children ranging in ages from 2 to 18 years, and that her adult son with autism was a source of stress even though he was easy to manage. (PageID No. 529.) Dr. Wood assured her that this was normal and opined that a return to work was "appropriate" if limited to part-time at first. *Id.*

In August of 2008, Plaintiff saw Dr. Hunter on an emergency basis when Dr. Wood was unavailable. (PageID No. 527.) Dr. Hunter's notes reflect that Plaintiff stated that she was worried that her medication needed to be adjusted. (*Id.*) She also related experiencing racing thoughts, anxiety, and hyper alertness, wanting to isolate herself from others at times, and was upset that her social security case was not progressing. (*Id.*) Dr. Hunter noted that Plaintiff harbored anger, irritiablity, agitation, anxiety and restlessness in his is mental status examination.

(*Id.*)  He further noted that records indicated that Plaintiff experienced success when treated with Xanax and Paxil in the past, so he changed her medications.  (*Id.*)  Dr. Hunter saw Plaintiff again on September 16, 2008, and she appeared alert and cooperative but had to move around a lot because she was watching her young son during the appointment.  (PageID No. 526.)  Plaintiff talked about trying to avoid emotional eating, but her five children contributed to her anxiety and binge eating.  (*Id.*)  They also talked about increasing her exercise.  (*Id.*)  Dr. Hunter noted that Plaintiff appeared to doing better as a result of his changes to her medications and recommended a follow up visit in three months.  (*Id.*)  Plaintiff called Tri-County twice in October, however, to report that an increase in her Xanax was not working and to request an earlier follow up appointment. (PageID No. 523, 524.)

### 2.     Treating Physician, Dr. Thomas Vajen

Plaintiff first saw psychiatrist, Dr. Thomas Vajen, at Six County in November of 2008 when Dr. Hunter was out ill.  He took over Plaintiff's treatment in January of 2009.  (PageID No. 521, 517.)  During his first appointment with Plaintiff, Dr. Vajen diagnosed Plaintiff with atypical depression, bipolar disorder, anxiety order not otherwise specified versus panic disorder with agoraphobia, and post traumatic brain injury from her car accident in 1998.  (PageID No. 522.)  He leaned toward a diagnosis of panic disorder and agoraphobia because Plaintiff reported a year of almost daily panic attacks.  (PageID No. 521.)  Plaintiff also reported that she had been in a car accident in 1998, after which she was life-flighted to Grant Hospital where she remained hospitalized for two weeks after being unconscious for up to 48 hours.  (*Id.*)  Plaintiff related that low dose Prozac, and increases in Xanax had been helpful to her in the past.  (Id.)  She also related that Abilify definitely improved her depression.  (Id.)  Dr. Vajen's mental status examination indicated that Plaintiff was alert, cooperative, carried on good conversation, and had

no hallucinations, but she complained of problems with her short term memory, concentration, irritability, and decision making.  (PageID No. 521.)  She reported no hallucinations but did have some visual disturbances at times. (*Id.*)

In December of 2008, Dr. Vajen wrote that Plaintiff stated that she lacked energy and felt panic and paranoia at times.  (PageID No. 519.)  In his mental status examination, he noted that Plaintiff appeared alert and cooperative, exhibited no signs of psychosis, and had no hallucinations, but expressed paranoid feelings.  (*Id.*)  Dr. Vajen made changes to her medications.  (Id.)  That same day, he wrote out a return to work note, stating that Plaintiff could not "work for the next six months due to her medical condition."  (PageID No. 502.)

At Plaintiff's January 7, 2009 follow up visit, she expressed that winter months were hard for her and that she was under a lot of stress because of her five children, including her autistic son for whom she cared.  (PageID No. 517.)  She was also in the process of getting a divorce. (*Id.*)  Plaintiff's panic attacks were reasonably controlled with Xanax, but Abilify caused her to gain weight.  (*Id.*)  Dr. Vajen made more changes to Plaintiff's medications and noted in his mental status examination that she appeared alert and cooperative with a somewhat depressed facies.  (*Id.*)  Plaintiff called Tri-County three times before her next appointment on March 25, 2009 to see if her medications could be adjusted, and some changes were made. (PageID No. 512, 515, 516.)  At the March 25 visit, Dr. Vajen mental status examination indicated that Plaintiff appeared alert and cooperative although she had a somewhat depressed facie. (PageID No. 511.)  Plaintiff reported that she was under a lot of stress because her 14 year old daughter was truant, defiant, and sexually active; Plaintiff continued to care for her adult autistic son; and Plaintiff was separated from her husband.  (*Id.*)  Plaintiff's medications were again adjusted. (*Id.*)

An updated diagnostic assessment was also done during the last week in March of 2009 by a social worker at Tri-County.  (PageID No. 513–14.)  Plaintiff stated that she had "a lot of depression and a lot of problems with [her] daughters" and guilt feelings about being separated from her children when incarcerated for a DUI conviction in the past.  (PageID No. 513.)  She reported that she had three good friends and help from her mother.  (*Id.*)  She attended church every Sunday and liked reading and walking.  (*Id.*)  She presented with logical thought processes, was oriented, cooperative, and exhibited no overt signs of psychosis.  (*Id.*)  She was assigned a GAF score of 53.[2]  (*Id.*)

Plaintiff called and requested another medication change on April 16, 2009, but she was told that there would be no changes until her next appointment on April 23, 2009.  (PageID No. 510.)  During the April visit, Plaintiff again stated to Dr. Vajen that she was under a lot of stress and had been depressed at times.  (PageID No. 509.)  Plaintiff's 14 year old daughter was still truant; her electricity had been turned off; and she had lost a card that allowed her to access support money.  (*Id.*)  Dr. Vajen mental status examination indicated that Plaintiff was alert and cooperative but had a somewhat flat affect and depressed facies. (*Id.*)  He also wrote that Plaintiff related some suicidal thoughts but no suicide plans, and occasionally saw spots.  (*Id.*)  He made changes to her medications, including a prescribing Adderall, and recommended a follow-up appointment in August.  (*Id.*)

On May 21, 2009, Dr. Vajen wrote that Plaintiff told him that she was walking three miles a day, "doing much better" and "doing great" since switching to Adderall and was "focusing better, taking care of herself, watching her carbs, exercising, and able to complete tasks."  (PageID No. 505.)  Plaintiff was very alert and cooperative, her flat affect and depressed

---

[2] A GAF score of 53 is indicative of serious symptoms or serious impairment in social, occupational, or school functioning (no friends, unable to keep a job).  *See* DSM-IV-TR).

facies were gone, and she reported no suicidal thoughts.  (*Id.*)  On June 8, 2009, however, Plaintiff called Tri-County to report that she was depressed, anxious, wanting to stay inside, and hoped for medication changes.  (Page ID No. 369.)  Plaintiff was told that there would be no changes to her medications until her next appointment, but that she could have an appointment on June 19 2009, instead of waiting until August.  (*Id.*)

On June 10, 2009, Plaintiff was hospitalized after overdosing on a mood stabilizer, Stelazine.  (PageID No. 578–79.)  During hospital intake, it was noted that Plaintiff was complaining of suicidal ideations and taking Stelazine one hour before going to the emergency room.  (PageID No. 583.)  Once there, Plaintiff told doctors that she was very stressed because her teenage children were out of school and getting into trouble, and she asked to be admitted for depression. (Id.)  She was admitted to an inpatient psych ward where she did "pretty well." (PageID No. 578.)  Plaintiff told doctors at the hospital that she had been anxious, nervous, and depressed, but had no thoughts about hurting herself, had no plans to hurt herself, and had wanted to get off one of her prescription medications, benzodiazepine (Xanax).  (PageID No. 578–79.)  A mental status examination reflects that Plaintiff was pleasant, cooperative, well groomed, and her speech clear and goal-oriented.  (PageID No. 579.)  The impression of one of the doctors who treated her at the hospital was that this was an intentional Stelazine overdose and an attempt at suicide.  (PageID  No. 580.)  Plaintiff was released four days later on June 13, 2009.  (PageID No. 578.)

Plaintiff continued to treat with Dr. Vajen for two and half years after this hospitalization. During her first post-hospitalization appointment on July 17, 2009, Dr. Vajen noted that Plaintiff had been taken off Adderall and Xanax while hospitalized and that she felt better about four days after that change.  (PageID No. 608.)  Dr. Vajen's indicated that Plaintiff was cooperative, but

she had a somewhat depressed facies and no energy.  (*Id.*)  She also had no suicide ideations at that time and no suicide plans ever.  (*Id.*) Dr. Vajen made changes to Plaintiff's medications during that visit.  (*Id.*)  He also wrote in his treatment notes that "[Plaintiff] is unemployable and I expect this to be as far forward as we can see and feel that she deserves disability on the basis of her mental health issues."  (PageID No. 608.)

On September 23, 2009, Dr. Vajen wrote that Plaintiff had a depressed facies and some suicidal ideations with no plans.  (PageID No. 633.)  She reported feeling rather down the last two to three weeks.  (*Id.*)  Dr. Vajen wrote a letter that day addressed to the Social Security Administration and stated that Plaintiff had been compliant with her visits and medications over the last two years; that she was unable to hold any meaningful employment for any period of time; and that she was disabled due to her psychiatric problems indefinitely.  (PageID No. 611.)

 On October 28, 2009, Dr. Vajen reported that Plaintiff said an adjustment to a medication the month before "definitely improved her situation."  (PageID No. 632.)  He wrote that Plaintiff's affect was slightly flat but her suicidal thoughts had passed.  (*Id.*)  He also wrote that he and Plaintiff were both hopeful about her upcoming Social Security hearing.  (*Id.*)  On December 3, 2009, Dr. Vajen noted that Plaintiff was "doing very well on her medications" and was "functioning well in her life."  (PageID No. 630.)  He also noted that Plaintiff complained about shaking in one leg.  (*Id.*)

Three months later, on March 3, 2010, Dr. Vajen wrote that Plaintiff was depressed over the previous months because she had a hard time with snow and winter, lost her Social Security appeal, and her fifteen year old daughter was pregnant.  (PageID No. 628.)  He also wrote that she had "fleeting" thoughts about suicide, but no plans.  (*Id.*)  On May, 5, 2010, Dr. Vajen noted that Plaintiff was "having a hard time" with her children because her thirteen year old daughter,

who was on probation for truancy, was being rebellious and refusing to go to school, and her fifteen year old daughter had miscarried.  (PageID No. 626.)  His mental status examination indicated that she had no suicidal ideations.  (*Id.*)  On July 23, 2010, Dr. Vajen noted that Plaintiff was tearful about continued issues with her children, including her nineteen year old son being put on probation for underage drinking.  (PageID No. 624.)  Although tearful, she had no suicidal ideations.  (*Id.*)

On August 27, 2010, Dr. Vajen wrote that Plaintiff's family and money challenges continued, and that Plaintiff told him that her nineteen year old son had "been on drugs." (PageID No. 622.)  In his mental status exam, Dr. Vajen recorded that Plaintiff was depressed about gaining weight and having no money for her kids' clothing, but she had no suicidal ideations.  (*Id.*)  Dr. Vajen prescribed Adderall because Plaintiff had done well on it before her hospitalization.  (*Id.* )  Dr. Vajen's October 22, 2010 notes reflect that Plaintiff responded well to the Adderall and that she told Dr. Vajen that she was more active, better able to focus, and consciously exercising and eating to lose weight.  (PageID No. 649.)  She had no suicidal ideations at that time.  (*Id.*)

Plaintiff brought her young son to a January 14, 2011 appointment and told Dr. Vajen that she continued to function well on Adderall, but the effect seemed to wear off in the early afternoon.  (PageID No. 697.)  On April 14, 2011, Dr. Vajen wrote that Plaintiff was doing "reasonably well."  (PageID No. 695.)  During that appointment, Plaintiff told Dr. Vajen that she functioned better on Adderall, and that she had been doing well on a combination of Wellbutrin and Celexa.  (*Id.*)  She was also functioning well at home, and continuing to care for her adult autistic son. (*Id.*)  He noted that she had been denied Social Security several times and that he

15

felt that "she should get and deserves it."  (*Id.*)  Notes from both visits indicated that Plaintiff had no suicidal ideations.  (PageID No. 697, 695.)

On June 22, 2011, Dr. Vajen wrote that Plaintiff had some crying and related concerns about family members trying to take her adult autistic son so they could get his disability payments.  (PageID No. 693.)  He also wrote that he and Plaintiff discussed her depression but she had no suicidal ideations at that time.  (*Id.*)  He noted that Plaintiff had a brain injury in the past, a history of bi-polar disorder, severe panic attacks at times, and agoraphobia.  (*Id.*)  He opined that Plaintiff could not work around people, complete tasks, or receive criticism or instructions well, and that "she certainly deserves disability."  (*Id.*)  Plaintiff presented Dr. Vajen with papers to be filled out for her Social Security claim.  (*Id*.)

That day, Dr. Vajen filled out a mental residual functional assessment form ("the June 22, 2011 RFC") indicating that Plaintiff was "markedly" impaired in the ability to accept instructions or criticism from supervisors; to work in coordination with or close proximity to others without distracting them; to maintain socially appropriate behavior; and that she was "moderately" impaired in her ability to respond appropriately to coworkers.  (PageID No. 219.)  He also indicated that Plaintiff was markedly impaired in the ability to perform and complete work tasks in a normal work day or week at a consistent pace; to work in close proximity to others without becoming distracted; to process information and exercise judgment; to carry through with instructions and complete tasks independently; to maintain attention and concentration for more than brief periods; and to perform at normally expected production levels.  (PageID No.  220.)  Last, Dr. Vajen indicated that Plaintiff was markedly impaired in her ability to respond appropriately to work changes; to remember locations, procedures, and instructions;

to be aware of normal hazards and take necessary precautions; to behave predictably, reliably, and in an emotionally stable manner; and to maintain personal appearance and hygiene.  (*Id.*)

According to Dr. Vajen's treatment notes, Plaintiff was "doing o.k.," and was "doing well on her medicines" at her next visit on September 14, 2011.  (PageID No. 691.)  On January 12, 2012, Dr. Vajen wrote that Plaintiff was "doing well."  (PageID No. 1048.)  She related to him that she had a good Christmas with her kids.  (*Id.*)  She had no suicidal ideations at that time. (*Id.*)  Dr. Vajen noted that her disability determination was being appealed.  He wrote: "I certainly hope she gets this as she deserves it."  (*Id.*)  He further wrote that "[w]e have discussed before that [Plaintiff cannot hold a job, and she cannot be around people, and she cannot be gainfully employed at this point in her life . . . disability is totally appropriate."  (*Id.*)

After Plaintiff's June 2009 hospitalization for the overdose of Stelazine, Dr. Vajen's notes indicate that although Plaintiff sometimes had auditory and visual hallucinations, they occurred occasionally, and Plaintiff often had no hallucinations of any kind.  (PageID 647, 691, 695, 697, 1048.)  Throughout this period, his notes also reflect that Plaintiff had no neural or muscular symptoms or homicidal ideations.  (*Id.*)

**C.      Treating Therapist, Gail Campbell**

The record contains a one page letter from Gail Campbell, Professional Clinical Counselor, dated August 27, 2007.  (PageID No. 493.)  It states that Plaintiff presented to Therapist Campbell with symptoms of Bipolar and Post-Traumatic stress disorders.  (*Id.*) Therapist Campbell wrote that in addition to depressive, manic, and anxious symptoms, Plaintiff had significant life disruptions that exacerbated her symptoms, and that these mental health conditions and life stressors impaired Plaintiff's social and occupational functioning.  (*Id.*)

Therapist Campbell opined that work would be contra-indicated for Plaintiff at the time and likely to cause increased emotional decompensation.  (*Id.*)

**D.      Miscellaneous Treatment Records**

The record also contains medical records from various sources reflecting routine doctor appointments for check-ups and treatments for minor injuries and colds.  Records from Muskingham Valley Health Centers reflect that during such visits on February 10, 2011, and June 13, 2011, Plaintiff complained about depression.  (PageID No. 1026, 1012.)  At a subsequent visit to Muskingham Valley on July 14, 2011, Plaintiff reported that "Lexapro and Abilify helped tremendously."  (PageID No. 1011.)

**C.      Evaluating Physician, Dr. Margaret Smith**

Psychologist Margaret Smith consultatively evaluated Plaintiff on June 4, 2007.  (PageID No. 412–421.)  Dr. Smith wrote that Plaintiff arrived to the examination on time.  (PageID No. 415.)  Plaintiff's appearance, gait, and speech were all normal; her hygiene adequate; her dress and grooming casual.  (*Id.*)  Dr. Smith also wrote that Plaintiff maintained upright posture and appropriate eye contact.  (*Id.*)  Dr. Smith noted that Plaintiff's social skills were in the normal range, and she was an adequate historian.  (*Id.*)  Plaintiff's mood was normal and affect was somewhat anxious, at least initially, but she relaxed as the interview progressed and became quite pleasant.  (*Id.*)  Signs of anxiety included sitting forward and fidgeting.  (*Id.*)  Plaintiff was oriented as to person, place, and time, and she had no unusual thoughts or associations.  (PageID No. 416.)  Plaintiff told Dr. Smith that she sometimes felt that people were staring at her and judging her, but Plaintiff showed no signs of psychosis.  (*Id.*)  Plaintiff also described being worried about her house being clean but, feeling too overwhelmed to start tasks.  (*Id.*)  Plaintiff did not report post traumatic revivification experiences.  (*Id.*)  Plaintiff told Dr. Smith that she

had nightmares about the police chasing her or about domestic violence issues with an ex-husband two or three times a week.  (*Id.*)

Plaintiff informed Dr. Smith that she had been diagnosed with bi-polar disorder and a possible post-traumatic stress disorder from an automobile accident.  (PageID No. 412.)  Plaintiff stated that that she was involved in a car accident in 1998 in which she sustained head trauma.  (*Id.*)  She said that she was hospitalized for ten days and received 98 stitches as a result of the accident.  (*Id.*)  Plaintiff also reported a history of headaches.  (*Id.*)  Plaintiff told Dr. Smith that she vacillated between being highly energized and then crashing and being depressed and unmotivated.  (*Id.*)  Plaintiff also complained about being agitated, stressed, and having social anxiety and panic attacks, which she described as being "just worry, like just worry, like something bad will happen… ."  (*Id.*)

Plaintiff related a history of alcohol abuse, and serving eight months after three DUIs.  (PageID No. 413.)  She had various criminal charges prior to her incarceration, but none since.  (*Id.*)  She described her mother as controlling and described her relationship with her father as "O.K."  (*Id.*)  Her first marriage ended because her husband was on drugs and her second marriage ended because of domestic violence issues.  (*Id.*)  Her current marriage included "a lot of baggage" and she and her spouse both desired counseling.  (*Id.*)  Plaintiff noted that she had five children, including an adult son with autism.  (*Id.*)  She stated that she sometimes assisted her husband in getting her children ready for school and that she cared for her adult autistic son with help from her mother, who is a nurse.  (PageID No. 413–14.)  She exercised, made meals, and engaged in personal hygiene on a daily basis, and performed housework three or four times a week.  (*Id.*)  Despite this, she felt overwhelmed and thought she needed another type of medicine.  (*Id.*)

Dr. Smith administered several assessments to Plaintiff.  On the Weschler Adult Intelligence Scale-III, Plaintiff received IQ scores of 78 verbal, 75 performance, and 75 full-scale, which placed her in the borderline range of intellectual functioning.  (PageID No. 417.)  Plaintiff also received a score of 64 on the Weschler Memory Scale-III, which is slightly lower than expected given her full scale IQ score of 75.  (PageID No. 418.)  Dr. Smith opined that this indicates a mild deficit in memory ability, particularly on tests requiring more visual as opposed to auditory memory.  (*Id.*)  She noted no significant intellectual strengths or weaknesses.  (*Id.*)  Dr. Smith diagnosed Plaintiff with bipolar disorder; alcohol abuse in remission; borderline intellectual functioning; personality disorder, not otherwise unspecified; and assigned Plaintiff a GAF score of 50.[3]  (PageID No. 419.)  Dr. Smith suspected that Plaintiff may have underreported her alcohol issues.  (*Id.*)  She also suspected that Plaintiff may have some anti-social traits, but did not think Plaintiff's description of her panic symptoms supported a diagnosis of panic disorder.  (*Id.*)  Dr. Smith also did not believe that there was sufficient evidence of PTSD during the interview.  (*Id.*)

Dr. Smith further opined that Plaintiff was limited to performing simple repetitive work tasks such as Plaintiff had done in the past as a nurse's aide, waitress, or factory worker.  (PageID No. 420.)  Dr. Smith opined that Plaintiff may require close supervision, and would do best in settings requiring minimal social interactions.  (*Id.*)  Further, Dr. Smith opined that "at this point" Plaintiff would be markedly limited in the ability to handle work stressors.  (*Id.*)

**D.     Reviewing Physicians, Dr. Vicki Casterline and  Dr. Mel Zwissler**

On July 10, 2007, state-agency psychologist Dr. Vicki Casterline reviewed the record.  (PageID No. 440–57.)  Dr. Casterline concluded that Plaintiff was markedly limited in the ability

---

[3] A GAF score of 50 is indicative of serious symptoms or serious impairment in social, occupational, or school functioning (no friends, unable to keep a job).  *See* DSM-IV-TR.

to understand, remember, and carry out detailed instructions and to interact appropriately with the general public.  (PageID No. 440–41.)  She also concluded that Plaintiff was moderately limited in the ability to remember locations and work-like procedures; to remember and carry out very short and simple instructions; to maintain attention and concentration for long periods; to perform activities within a schedule, maintain regular attendance, and be punctual; to sustain an ordinary routine without supervision; to complete normal workdays and workweeks without interruptions from symptoms or perform at a consistent pace; to ask simple questions or request assistance; to accept instructions and criticism; to get along with coworkers without distracting them; to respond to workplace changes; to travel to unfamiliar places or use public transportation; and to set realistic goals or make independent plans.  (*Id.*)

While reviewing Plaintiff's file, Dr. Casterline noted that Plaintiff had previously been awarded benefits in 2000 for psychological impairments that began in 1999.  (PageID No. 442.)  Those benefits ceased in 2002 when Plaintiff had started working with the BVR but failed to provide the Social Security Administration information about her employment there.  (*Id.*)  At the time those benefits were discontinued, Plaintiff's treatment notes indicated that her depression had improved and that she had applied to nursing school.  (*Id.*)  Plaintiff's 1996 IQ scores from the previous file were relatively commensurate with the IQ scores obtained by Consulting Physician, Dr. Smith.  (*Id.*)  Dr. Casterline noted that a consultative examination had been performed in 2000 as part of Plaintiff's previous claim, but she gave weight to Dr. Smith's June 2007 consultative report, although she believed Dr. Smith's estimated GAF score of 50 was somewhat low in light of a GAF score of 68 from Tri-County in May of 2007.  (PageID No. 442–43.)  She also found that, consistent with Dr. Smith's report, Plaintiff was "capable of performing simple, repetitive tasks, which do not require her to have frequent interaction with

others."  (PageID No. 443.)  State-agency reviewer Mel Zwissler, Ph.D reviewed the file on

October 11, 2007, and affirmed Dr. Casterline's assessment.  (PageID No. 494–96.)  He gave

weight to Dr. Wood's August 2007 diagnosis.  (PageID No. 495.)

### IV.    THE ADMINISTRATIVE DECISION

On May 2, 2012, the ALJ issued a final decision.  (PageID No. 48-71.)  The ALJ found

that Plaintiff had the following severe impairments: status post remote head injury; borderline

intellectual functioning; major depression; and an anxiety disorder.  (PageID No. 50.)  He also

concluded that Plaintiff had not "received any additional or alternative treatment for her

psychological diagnoses compared to the treatment received at the time of the administrative law

judge decision of January 15, 2010, and there has been no significant change in the claimant's

overall mental status and functioning."  (PageID No. 51.)  He further found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled one of the

listed impairments.  (PageID No. 53.)  The ALJ set forth Plaintiff's residual functional capacity

as follows:

> After careful consideration of the entire record, the undersigned finds that
> [Plaintiff] has the residual functional capacity to work at all levels of physical
> activity with the exception that she is limited to the performance of simple,
> routine, and repetitive tasks, for two hour periods before she requires a short
> break in order to regain mental freshness.  Such work tasks should involve no
> more than casual infrequent contact with others and should not involve high
> production quotas and/or strict time deadlines.

(PageID No. 56.)  The ALJ noted that this residual functional assessment was consistent with the

opinions from Drs. Casterline and Dr. Zwissler, was supported by other record evidence,

including treatment notes from Plaintiff's physicians, and Plaintiff's activities of daily living.

(*Id.*)  Relying upon the VE's testimony, the ALJ concluded that Plaintiff was unable to perform

any of her past relevant work, but that she could perform jobs that exist in significant numbers in the national economy.  (PageID No.  63, 64.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff alleges numerous assignments of errors.  First, Plaintiff contends that the ALJ failed to properly evaluate opinion evidence from Dr. Vajen, including Dr. Vajen's June 22, 2011 RFC.   Second, Plaintiff asserts that the ALJ failed to properly evaluate opinion evidence from Therapist Campbell and Drs. Smith and Zwissler.  Last, Plaintiff maintains that the ALJ's hypothetical questions to the vocational expert did not accurately portray Plaintiff's relevant limitations.  These arguments are addressed separately.

**A.    The ALJ Properly Evaluated Opinions from Treating Psychiatrist, Dr. Vajen**

Plaintiff asserts that the ALJ erred by rejecting opinions from Dr. Vajen and for failing to provide good reasons for doing so.  The Undersigned disagrees.

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  The regulations further provide that the ALJ must consider several factors when determining what weight to give each medical opinion, including, but not limited to, the examining relationship, the treatment relationship, supportability, consistency, and specialization ("the regulatory factors").  *Nelson v. Comm'r of Soc. Sec.*, No. 05-5879, 2006 WL 2472910, at *7 (6th Cir. Aug. 28, 2006) (summarizing 20 C.F.R. §§ 404.1527 and 416.927).  With regard to the second factor, treating relationship, a medical opinion from a treating source is given controlling weight if it is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case record.  *Id.*  Deference is due to a

treating source's medical opinion, but only when a treating source supplies sufficient medical

data to substantiate a diagnosis or an opinion.  *Id.*

If an ALJ does not give a treating source's opinion controlling weight, the ALJ must meet

certain procedural requirements.  *Wilson v. Comm'r  of Soc. Sec*, 378 F.3d 541, 544 (6th Cir.

2004).  Specifically, when a treating source's opinion is not given controlling weight:

> [a]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

Regulations also provide that an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20

C.F.R. § 416.927(c)(2).  An ALJ's reasoning "must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, ***No.*** 09-3889, 2010 WL

1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of

Appeals for the Sixth Circuit has explained the rationale behind the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.
> *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F3d at 544–55.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Violation of the good reason requirement may, nevertheless, constitute harmless error in certain instances.  *Wilson,* 378 F.3d 547.  First, harmless error may occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it."  *Id.* Harmless error may also occur when an ALJ's determination is consistent with a medical opinion, which would make weighing that opinion, and explaining the weight, irrelevant.  (*Id.*) Finally, harmless error may occur when the goal of the good reason rule is met and a claimant can understand why his or her treating physicians' opinions have been discounted even in the absence of a specific explanation.  (*Id.*)

### 1.       The ALJ Properly Evaluated Opinions in Dr. Vajen's Treatment Records

Plaintiff complains that Dr. Vajen "offered several consistent opinions as to Plaintiff's functional limitations" and that "[t]hese opinions should have been examined for controlling weight… ."  (Pl's Statement of Specific Errors 11, ECF No. 11).  But the ALJ clearly considered the opinions contained in Dr. Vajen's treatment records about Plaintiff's functional limitations. The ALJ wrote:

> On December 4, 2008, Dr. Vajen assessed that the claimant was unable to work for the preceding six months . . . On July 19, 2009, Dr. Vajen assessed that the claimant was unemployable secondary to her mental health issues . . . On September 23, 2009, Dr. Vajen assessed that the claimant was "unable to hold any meaningful employment for any period of time" and that she was "disabled due to her psychiatric problems indefinitely" . . . On January 12, 2012, Dr. Vajen assessed that the claimant "cannot be gainfully employed at this point in her life" . . . On April 14, 2011, Dr. Vajen assessed that the claimant "deserves" disability . . . On June 22, 2011, Dr. Vajen assessed that the claimant "certainly *deserves* disability" . . . because she has panic attacks at time, has agoraphobia, cannot work around people, cannot complete tasks, and cannot take  criticism or instructions well

(Page ID No. 62) (internal citations omitted).  The ALJ determined that these opinions were only afforded partial weight, stating:

> Dr. Vajen's opinions are assigned partial weight, in that it is acknowledged that the  [Plaintiff] experiences some psychological symptom that would reduce her mental functioning to the extent that she is limited to the performance of simple routine tasks outlined [in the ALJ's residual functional capacity finding].

(Page ID No. 62).

The ALJ explicitly provided four good reasons for arriving at this determination.  First, the ALJ explained that "Dr. Vajen's opinions are internally inconsistent with his own documented objective findings that the claimant functions well and that she does well with medication management of her symptoms."  (*Id.* at 62.)  Substantial evidence supports this determination.  The ALJ cited multiple instances where Dr. Vajen's treatment notes stated that Plaintiff was "doing well," "functioning," or responding positively to changes in her medications.  (PageID No. 58–59.)  Many of these positive reports appeared in notes made in the two and half years after Plaintiff was hospitalized in June of 2009 for a Stelzine overdose. (PageID No. 630, 632, 649, 691, 695, 1048.)  This was a good reason for discounting Dr. Vajen's opinions.  *See Dawson v. Comm'r of Soc. Sec.*, 468 Fed.Appx. 510, 513 (6th Cir. 2012) (finding ALJ properly discounted a treating physician's opinion where the physician's conclusions were inconsistent with his own progress notes).

Second, the ALJ explained that Dr. Vajen's opinion that Plaintiff could not work because of her panic attacks, agoraphobia, an inability to work around people, and to take criticism or instructions was not supported by substantial evidence, particularly Plaintiff's activities of daily living.  (PageID No. 62.)  Substantial evidence supports this determination as well.  The record reflects, and the ALJ noted that Plaintiff cared for her minor children, helped care for her adult

son with autism, prepared meals, regularly exercised, maintained social contacts, and attended church.  (PageID No.  59, 62–63).  This was also a good reason for discounting Dr. Vajen's opinions  *See Dawson*, 468 Fed.Appx. at 513–14 (finding ALJ properly discounted a treating physician's opinion where the opinion was inconsistent with the claimant's daily activities).

Third, the ALJ provided that Dr. Vajen's opinions were not entitled to controlling weight because although Dr. Vajen opined that Plaintiff was "disabled" or "deserving" of disability, "it is not clear if [Dr. Vajen] is familiar with the definition of disability contained in the Social Security Act and regulations."  (Page ID No. 63).  Stated differently, these opinions relate to an issue "reserved to the Commissioner," and thus they are never entitled to controlling weight.  20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3); *see also* Soc. Sec. Rul. 96-5p, 1996 WL 374183 at *2.  This too, was a good reason for discounting Dr. Vajen's opinions.  *Id.*

Last, the ALJ stated that Dr. Vajen may have formed his opinions because he sympathized with Plaintiff or acquiesced to her demands in order to avoid tension in their doctor patient relationship.  (Page ID No. 63).  Although the ALJ stated that it was difficult to confirm the presence of such motives, he noted that they are more likely when an opinion runs substantially counter to the rest of the record evidence such as in this case.  *Id.*  Other circuits have observed that a patient's treating physician "may want to do a favor for a friend and a client" and thus might be too quick to find that a patient has a disability.  *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Reynolds v. Bowen*, 844 F.2d 451, 45 (7th Cir. 1988)).  The Sixth Circuit has faulted an ALJ for rejecting a treating physician's opinion solely because the ALJ found that the physician's motives were suspect, but the Court has not prohibited an ALJ from examining a treating physician's motives.  *Yates v. Colvin*, 940 F.Supp.2d 664, 676 (S.D. Ohio, 2013) (citing *Blakeley v. Comm'r of Soc. Sec.*, 581, F.3d 399, 408 (6th Cir. 2009)).

Here, the possibility that Dr. Vajen may have been motivated by sympathy or a desire to avoid tension was one of four reasons the ALJ explicitly gave for assigning Dr. Vajen's opinions partial weight.  As such, this was a proper consideration.

Plaintiff complains that the ALJ never stated that Dr. Vajen's opinions were not entitled to controlling weight before explaining that they were only assigned partial weight.  (Pl's Statement of Specific Errors 11, ECF No. 11).  But the opinions were entitled to partial weight for the same reasons that they were not entitled to controlling weight.  In this case, the ALJ was not obligated to list those reasons twice.  Moreover, as described in the next section, the ALJ detailed problems with Dr. Vajen's opinions throughout his written decision.  (Page ID No. 58–59, 62).  He thus made it abundantly clear how he arrived at his conclusion.  In so doing, the ALJ satisfied the good reason rule, which is met when an ALJ's decision allows for adequate review and a Plaintiff can discern the rationale for an unfavorable decision.  *Coldiron v. Comm'r of Soc. Sec.*, No. 09-4071, 2010 WL 3199693, at *4 (6th Cir. Aug 12, 2010).  Indeed, an ALJ may accomplish this goal by indirectly attacking the supportability of a treating source's opinion.  *Nelson,* 2006 WL 2472910, at *7.  Here, in this case, the ALJ explicitly pointed to four shortcomings in the opinion contained in Dr. Vajen's treatment records.  This constitutes a direct attack.  That the ALJ did not first state that these opinions were not entitled to controlling weight before explaining that they were only entitled to partial weight is harmless error in this case, if it is error at all.  *Id.*

## 2.    **Dr. Vajen's June 22, 2011 Residual Functional Capacity Opinion**

The ALJ did not specifically discuss Dr. Vajen's June 22, 2011 RFC.  Plaintiff contends that the ALJ failed to evaluate it or make it part of the record. The Undersigned disagrees.

To begin, the June 22, 2011 RFC is part of the record.  The June 22, 2011 RFC was accepted into evidence at the April 17, 2012 hearing and marked as Exhibit 40F to the hearing transcript.  (PageID No. 90).  Exhibit 40F was inadvertently omitted when the administrative record was certified on March 20, 2013.  (ECF *No.* 17).  That omission was, however, rectified by a Supplemental Certification on July 23, 2013.  *Id.*  In addition, the June 22, 2011 RFC had previously been sent by facsimile to the Social Security Administration on July 5, 2011.  The faxed copy of June 22, 2011 RFC is part of the original certified record.  (PageID No. 219–221).  The only difference between the faxed copy of the document and the document marked as Exhibit 40F, is that a time and date stamp appears on the faxed copy indicating when it was sent to the Administration's offices.  (PageID No. 219–221; PageID No. 1103–1105).  The faxed copy of the June 22, 2011 RFC was attached as Exhibit 16B to the ALJ's second decision. (PageID No. 219–221).

In any event, the Undersigned does not agree that the ALJ failed to consider the June 22, 2011 RFC.  Although "an ALJ's failure to consider an entire line of evidence falls below the minimum level of articulation required, at the same time, an ALJ is not required to discuss every piece of… evidence." *Williamson v. Comm'r of Soc.*, No. 12-0244, 2013 WL 394572, at * 3 (S.D. Ohio Jan. 31, 2013) (internal citations omitted) (explaining that an ALJ can consider all the evidence without directly addressing each piece of evidence submitted by a party).  Further, "[a]n ALJ's failure to cite a specific piece of evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed.Appx. 727, 733 (6th Cir. 2004).  Thus, the fact that the ALJ did not specifically discuss the June 22, 2011 RFC does not necessarily indicate that the ALJ failed to consider it.  Nor is this an instance where an ALJ completely failed to address a

treating physician's opinions.  Rather, this is an instance where the ALJ simply did not discuss one of many medical records from Plaintiff's treating physician.

In this case, the ALJ properly considered Dr. Vajen's opinions and attacked their supportability and consistency when making a disability determination.  Indeed, the ALJ specifically discussed Dr. Vajen's June 22, 2011 progress notes, made on the same date as the June 22, 2011 RFC.  (PageID No. 62).  The ALJ explained that in those June 22, 2011 progress notes, "Dr. Vajen assessed that the claimant 'certainly *deserves* disability' (emphasis added), because she has panic attacks at time, has agoraphobia, cannot work around people, cannot complete tasks, and cannot take criticism or instructions well." (PageID No. 62).  This demonstrates that the ALJ was fully aware of the opinions held by Dr. Vajen on June 22, 2011.

To the extent that the ALJ was required to specifically discuss Dr. Vajen's June 22, 2011 RFC in addition to the June 22, 2011 treating notes, the ALJ's failure to do so constitutes harmless error.  In *Nelson*, an ALJ failed to discuss the opinions offered by one the plaintiff's treating physicians and only briefly addressed the opinion of a second treating physician.  2006 WL 2472910, at *4.  The Court of Appeals nevertheless concluded that the ALJ's evaluation of the plaintiff's mental impairments indirectly attacked the supportability of the treating physician's opinions and their consistency with the rest of the record evidence.  *Id.* at*8.  The ALJ's discussion of other evidence implicitly provided the reasons why the ALJ declined to give those opinions controlling weight and satisfied the purposes underlying the good reason requirement.  *Id.*

In this case, the ALJ's opinion goes even farther than the ALJ's opinion in *Nelson*— the ALJ in *Nelson* made brief mention of the opinions from the treating physicians and gave no indication what weight was assigned to each.  Here, the ALJ here extensively addressed Dr.

Vajen's opinions about Plaintiff's functional capacities in his treatment notes and afforded those opinions partial weight.  The ALJ also extensively discussed how Dr. Vajen's treatment records failed "to substantiate the extent or severity of the claimant's alleged associated symptoms" of bi-polar disorder with anxiety and personality disorder, by going through Dr. Vajen's records from January, 2006 until September, 2011, and noting various instances where Dr. Vajen's records reflected a relatively positive prognosis.  (PageID No. 58–59.)  The ALJ wrote as follows:

> On April 23, 2009, Dr. Vajen reported that the clamant had been depressed "at times" and that she felt "more down than usual."  Dr. Vajen described [Plaintiff's affect as only "somewhat" flat and depressed . . . [O]f most significance . . . although [Plaintiff] had called into Dr. Vajen's office one week prior to this appointment . . . Dr. Vajen simply advised [Plaintiff] to wait until her previously scheduled appointment . . . He did not make any changes to [Plaintiff's] medication regime at the time or offer [Plaintiff] an earlier appointment . . . as would be expected if she were truly experiencing a significant exacerbation of her symptoms . . .

> On May 21, 2009, [Plaintiff] informed [Dr. Vajen] that she was "doing much better" on an increased dose of Abilify combined with Adderall. [Plaintiff] also related that she was "doing great" and "focusing better, taking care of herself watching her carbs, exercising, and able to complete tasks . . .

> On December 3, 2009, Dr. Vajen reported that [Plaintiff] was "doing very well on her current meds" . . . and that she was "functioning well in her life" . . .

> In March 2010, Dr. Vajen reported that [Plaintiff] had felt depressed only over the previous several months, and because she was having a "hard time with the snow and winter" . . .

> On October 22, 2010, Dr. Vajen noted that [Plaintiff] had "responded well to Adderall," in that she was "more active, able to focus more, has started exercising . . . and has lost 8lbs with exercising and decreasing her diet" . . .

> On January 14, 2011, Dr. Vajen reported that [Plaintiff] was "functioning well" with Adderrall . . .

> In April 2011, Dr. Vajen reported that [Plaintiff] was doing "reasonably well" on Adderall; she was doing "well" on the combination of Wellbutrin and Celexa; and that she was "functioning well at home"  . . .

> In September of 2011, [Plaintiff] was described as both "doing okay" and "doing well on medicines" . . .
>
> The totality of the reports and statements from Dr Vajen specifically documenting [Plaintiff's] overall mental status and response to treatment fail to corroborate [Plaintiff's] allegations of disabling psychological symptoms . . . To the contrary, Dr. Vajen's records substantiate that [Plaintiff] has good overall control of her symptoms and significant retained mental functioning with medication management of her symptoms. [Dr. Vajen's] findings are consistent with the conclusion that [Plaintiff] is capable of engaging in the residual functional capacity outlined herein

(PageID No. 58–59.)

In addition to this discussion of how Dr. Vajen's treatment records did not substantiate the alleged severity of Plaintiff's conditions, the ALJ also concluded that the treatment records indicated that some of Plaintiff's symptoms could be attributed to her life circumstances. (PageID No. 58.)  Substantial evidence supports this conclusion.  For instance, two of Dr. Vajen's mental status examinations indicated that Plaintiff was tearful, but in both cases, Plaintiff's tears were about problem with her family.  (PageID No. 623, 693.)

The ALJ also discussed various issues that cast doubt upon Plaintiff's credibility. (PageID No. 60.)  The ALJ noted that Plaintiff's criminal record likely made obtaining employment difficult, Plaintiff exaggerated her symptoms at times, and Plaintiff made inconsistent statements.  (*Id.*)  Substantial evidence supports this conclusion.  Plaintiff admitted that her felony record prevented her from working in nursing, which she loved; Plaintiff told various healthcare providers that she was hospitalized for two week after her car accident when she was actually discharged after only three days; and Plaintiff made inconsistent statements about her leisure time activities and activities of daily living.  (PageID No. 426, 505, 513, 521, 108-110.)

Given the ALJ's detailed examination of the record evidence, remand is not required because the ALJ did not specifically discuss Dr. Vajen's June 22, 2011 RFC.  It is clear from the ALJ's determination why Dr. Vajen's opinions are not given controlling weight.  When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game."  *Little v. Colvin*, 2014 WL 496935, at * 8 (N.D. Ohio, Feb. 5, 2014) (quoting *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 177 (6th Cir. 2004)).

## B.  The ALJ Properly Evaluated Therapist Campbell's Opinion

 The Undersigned likewise concludes that the ALJ did not err when evaluating Therapist Campbell's opinion.  Ms. Campbell, a Professional Clinical Counselor, does not qualify as a treating source because the relevant regulations do not define mental health counselors as treating sources.  *See Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (citing 20 C.F.R §§ 404.1502; 404.1513(a)).  Thus, Ms. Campbell's opinions are not entitled to any particular weight.  *See* 20 C.F.R §§ 404.1513(a); 416913(a),(d).  Ms. Campbell is, instead, a valid "other source" whose opinion is entitled to consideration in conformity with the requirements of SSR 06-3p.  Soc Sec. Rul. No. 06-3p, 2006 WL 2329939, at *3 (Soc. Sec. Admin. Aug. 9, 2006).

SSR 06-3p provides that opinions from other sources "are important and should be evaluated on key issues such as impairment or severity and functional effects."  *Id.*  SSR 06-3p further provides that an ALJ should generally evaluate these opinions under the regulatory factors used to analyze opinions from treating sources.  *Id.* at *4.  Not every factor will, however, apply in every case.  *Id.*  An ALJ is not required to grant opinions from other sources controlling weight.  *Id.*  Importantly, an ALJ is only required to discuss other source opinions in enough detail to allow a claimant or subsequent reviewer to follow the ALJ's reasoning when an other

source opinion impacts a determination or is given more weight than an opinion from a treating source.  *Id.*

In this case, Ms. Campbell's opinion did not have an impact on the ALJ's determination and it was not given more weight that opinions from any treating sources.  Nevertheless, the ALJ discussed Ms. Campbell's opinion about Plaintiff's functional capacities and assigned that opinion partial weight.  (PageID No. 62.)  The ALJ wrote:

> On August 27, 2007, Gail L. Campbell, P.C.C. assessed that [Plaintiff] was unable to work . . . Ms. Campbell's opinion has been assigned partial weight, in that it is acknowledge that [Plaintiff] experiences some psychological symptoms that would reduce her mental functioning to the extent that she is limited to simple, routine tasks . . . However, Ms. Campbell's opinion cannot be assigned great weight because Ms. Campbell failed to explain what objective signs, symptoms, and clinical findings corroborated her assessment that claimant had a "serious" impairment of her social and occupational functioning. As noted throughout the decision, the preponderance of objective evidence on its face fails to establish any functional capacity limitations of such severity as to render [Plaintiff] completely incapable of engaging in all types of work.

(*Id.*)  This discussion is adequate in this case.  It illustrates that the ALJ specifically considered two of the regulatory factors, supportability and consistency, and found them lacking. Substantial evidence supports that determination.  The one-page letter contains no treatment information or clinical findings.  And there is substantial record evidence to support a finding of non-disability.  Accordingly, the ALJ did not err in assigning Ms. Campbell's opinion partial weight.

## C.  The ALJ Properly Evaluated Opinions From Evaluating Physician, Dr. Smith

Plaintiff asserts that the ALJ neglected to examine or weigh Dr. Smith's opinion. Relevant policy requires an ALJ to consider opinions from evaluating physicians and to "explain the weight given to these opinions in their decision."  Soc. Sec. Rul. No. 96-6p, 1996 WL 374180 at *1 (Soc. Sec. Admin. July 2, 1996).  Further, the regulatory factors used to evaluate

medical opinion evidence should be used to assess opinions offered by non-treating physicians including the examining relationship, the treatment relationship, supportability, consistency, and specialization.  *Id.*  But there is no good reason requirement for opinions from such sources. *Smith v Comm'r  of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).

The ALJ extensively discussed Dr. Smith's report in the first determination dated January 15, 2010.  That discussion was incorporated by reference into the second determination on May 2, 2012.  (PageID No.  51, 139).  The ALJ wrote as follows with regard to Dr. Smith:

> On June 4, 2007, [Plaintiff] was consultatively examined by Margaret G. Smith, Ph.D. for complaints of bipolar disorder and post traumatic stress disorder, which she attributed to a motor vehicle accident that occurred in October 1998 . . . The claimant described her psychologically based symptoms as increased irritability, depression, lack of motivation, crying spells, increased stress, social anxiety, and also periods of high energy. She admitted to a previous history of alcohol abuse, and three Driving Under the Influence (DUI) convictions during the period from 1990 to 2001. [Plaintiff] reported that she received poor grades in school and she described her reading and writing as "limited." [Plaintiff] described her daily activities as assisting with getting her kids ready for school, assisting in the care of her 23 year old autistic son, preparing dinner, performing household chores three or four times per week, and walking three or four times per week. She reported that she was able to care for her personal hygiene and grooming independently daily. A mental status examination of [Plaintiff] revealed that her social skills fell within the normal range. Dr. Smith described [Plaintiff's] mood as "normal" and her affect "somewhat anxious." [Plaintiff] did manifest some signs of anxiety, such as fidgeting and sitting forward in her chair. There was no evidence of psychomotor retardation. She was alert and fully oriented. [Plaintiff's] IQ scores, as measured by the Adult Wechsler Adult Intelligence Scale-III, were verbal 78, performance 75, and full scale 75, which placed her overall level of intellectual functioning within the borderline range. [Plaintiff] obtained a total memory composite score of 64 on the Weschler Memory Scale-III (WMS-III), which was lower than would be expected based on her full scale IQ score of 75.  Dr. Smith diagnosed [Plaintiff] with a bipolar I disorder, most recent episode unspecified; alcohol abuse, in reported remission; borderline intellectual functioning; and a personality disorder, not otherwise unspecified, with antisocial and avoidant traits. She rated [Plaintiff's] global assessment functioning (GAF) as 50. Dr. Smith assessed that he claimant was limited to performing simple repetitive work tasks, involving minimal social interactions with others.

(*Id.*)  The ALJ also discussed Dr. Smith's report in the second determination when concluding that that Plaintiff had moderate difficulties with social functioning, and with concentration, persistence, and pace.  (PageID No. 54.)

The ALJ did not, however, assign a specific weight to Dr. Smith's opinions.  In this case, that failure constitutes harmless error.  Dr. Smith opined that Plaintiff was limited to performing simple repetitive work tasks, in settings requiring minimal social interaction, and that she was markedly limited in her ability to handle work stressors.  (PageID No. 420.)  The ALJ included all of these functional limitations in his residual-functional capacity evaluation.  (PageID No. 56.)  Indeed, Dr. Smith opined that Plaintiff was able to do simple repetitive work tasks such as Plaintiff had done in the past as a nurse's aide, waitress, or factory worker.  (PageID No. 420.)  In contrast, and based upon VE testimony, the ALJ determined that Plaintiff could not perform her past work.  (PageID No. 63.)  The ALJ thus adopted a more restrictive residual functional capacity than that described by Dr. Smith.  The failure to assign a specific weight to Dr. Smith's opinion does not constitute reversible error.  *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, at *5 (6th Cir. 2004) (holding that although the ALJ did not specify her logic, the influence of each doctors' opinion was clear in her decision and thus conformed with the regulations).

**D.    The ALJ Properly Evaluated Opinions from Reviewing Physician, Dr. Zwissler**

Plaintiff argues that the ALJ adopted the October 11, 2007 opinion of reviewing physician, Dr. Zwissler "without any examination or explanation of what evidence it was based upon or supported it."  (Pl's Statement of Specific Errors 16, ECF No. 11).  SSR 96-6p also governs opinions from reviewing sources, and provides that an ALJ must consider and "explain the weight given to these opinions in their decision."  1996 WL 374180 at *1.  Further, the regulatory factors used to evaluate medical opinion evidence are to be used to assess opinions

offered by reviewing physicians including the examining relationship, the treatment relationship, supportability, consistency, and specialization. *Id.* But there is no good reason requirement for reviewing physicians. *Smith,* 482 F.3d at 876 (6th Cir. 2007).

On October 11, 2007, Dr. Zwissler affirmed Dr. Casterline's opinion that Plaintiff was "capable of performing simple, repetitive tasks, which do not require her to have frequent interaction with others." (PageID No. 443.) The ALJ examined Dr. Zwissler's October 11, 2007 opinion and wrote:

> [t]he state agency opinion [from Dr. Zwissler] has been considered in accordance with Social Security Ruling 96-6p. This assessment is consistent with and well-supported by the objective medical evidence and it is accepted as an accurate representation of the claimant's status.

(PageID No. 62.) The ALJ also concluded on May 2, 2012, that Plaintiff had not "received any additional or alternative treatment for her psychological diagnoses compared to the treatment received at the time of the administrative law judge decision of January 15, 2010, and there has been no significant change in the claimant's overall mental status and functioning." (PageID No. 51.) Substantial evidence supports these findings and no further explanation of the weight given Dr. Zwissler's opinion was required.

**E.      Reliance on the VE Testimony was Proper**

Last, Plaintiff challenges the validity of the hypothetical question that the ALJ posed to the VE in two ways. First, Plaintiff asserts that although the ALJ determined that one of Plaintiff's functional limitations is that she is limited to working "for two hour periods before she requires a short break in order to regain mental freshness," the ALJ failed to include that limitation in the hypothetical question. (PageID No. 56). Plaintiff is incorrect. The ALJ asked the VE to consider a person whose limitations included, among other things, the ability "to maintain concentration and attention for two hour segments over an eight hour work period."

(PageID No. 116).  The reference to "two hour work segments over an eight hour period" implied that the segments would be interspersed with breaks.  This portion of the hypothetical question thus adequately portrays the relevant limitation.  *See Brock v. Comm'r of Soc. Sec.*, 368 Fred Appx. 622, 626 (6th Cir. 2010) (explaining that even incomplete hypotheticals are acceptable so long as they accurately portray a claimant's restrictions).

Second, Plaintiff asserts that the ALJ concluded that Plaintiff's ability to tolerate ordinary workplace stress is moderately impaired, but the hypothetical failed to include that limitation. The Undersigned concludes that ALJ found that Plaintiff possessed this limitation.  The ALJ stated that his residual functional capacity determination was consistent with Dr. Casterline's opinion, and Dr. Casterline opined that Plaintiff possessed this limitation.  (PageID No. 56, 442.)  Nonetheless, the ALJ's hypothetical asked the VE to contemplate a worker restricted to "simple tasks and instructions… in a setting without strict production standards."  (PageID No. 116–17).  These restrictions accurately portrayed Plaintiff's moderate impairment to tolerate workplace stress.  *See Shepard v. Colvin*, No. 3:12cv-00149, 2013 WL 2179366, at *10 (S.D. Ohio May20, 2013) (finding that restricting work to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements" accounted for Plaintiff's moderate impairment in the ability to withstand the stress and pressure associated with day to day work.)

## VII.   CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that Plaintiff's Statement of Specific Errors be **OVERRULED** and that the Commissioner of Social Security's decision be **AFFIRMED**.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g., Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: August 5, 2014                                    /s/ *Elizabeth A. Preston Deavers*
                                                       Elizabeth A. Preston Deavers
                                                       United States Magistrate Judge